

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-13-1998

# Sullivan v. Barnett

Precedential or Non-Precedential:

Docket 96-2140

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Sullivan v. Barnett" (1998). *1998 Decisions.* Paper 46.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/46

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 13, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-2140

DELORES SCOTT SULLIVAN; WILLIAM BATTLE;
ANTHONY CANCILA; CHARLES MATTHEWS;
CHRISTOPHER COSTELLO; LISA LEX; SUSAN HANSEN,
On Their Own Behalf and on Behalf of All Similarly
Situated Class Plaintiffs; PHILADELPHIA AREA PROJECT
ON OCCUPATIONAL SAFETY AND HEALTH; THE
PHILADELPHIA FEDERATION OF TEACHERS, Local 3,
AFL-CIO

v.

ROBERT BARNETT, Secretary of Labor and Industry for
the Commonwealth of Pennsylvania; FRANK BEAL,
Director of the Pennsylvania Bureau of Workers
Compensation; CONSTANCE B. FOSTER, Insurance
Commissioner for the Commonwealth of Pennsylvania;
CATHERINE BAKER KNOLL, Treasurer, Commonwealth of
Pennsylvania; JOHN P. O'MALLEY, Director, State
Workers' Insurance Fund; AMERICAN MANUFACTURERS
MUTUAL INSURANCE COMPANY; CIGNA CORPORATION;
CONTINENTAL CASUALTY COMPANY; USF&G
INSURANCE COMPANY; ZURICH AMERICAN INSURANCE
COMPANY; SCHOOL DISTRICT OF PHILADELPHIA;
JOHNNY J. BUTLER, Secretary of Labor and Industry of
the Commonwealth of Pennsylvania; RICHARD A.
HIMLER, Director of the Pennsylvania Bureau of Workers
Compensation; COMMERCIAL UNION INSURANCE
COMPANY; DONEGAL MUTUAL INSURANCE COMPANY;
HARTFORD INSURANCE COMPANY

        Delores Scott Sullivan, William Battle, Louis
        Baumgartner,* Anthony Cancila, William C.
        Dillon,* Terrence Ervine,* Charles Matthews,
        Christopher Costello, Lisa Lex, Susan Hansen,
        Philadelphia Area Project on Occupational Safety
        and Health and Philadelphia Federation of
        Teachers,

        Appellants

*pursuant to Rule 12(a) FRAP

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 95-cv-00201)

Argued Thursday, September 11, 1997

BEFORE: MANSMANN, NYGAARD and GARTH, Circuit Judges

(Opinion filed March 13, 1998)

        Lorrie McKinley (Argued)
        McKinley & Vonier
        1333 Race Street
        Philadelphia, PA 19107

        Attorney for Appellants Delores Scott
        Sullivan, William Battle, Anthony
        Cancila, Louis Baumgartner and
        Class Plaintiffs

2

Alan B. Epstein
Jablon, Epstein, Wolf & Drucker
The Bellevue, Ninth Floor
Broad Street at Walnut
Philadelphia, PA 19102

Attorneys for Appellants
Charles Matthews, Christopher
Costello, Lisa Lex, Terrence Ervine,
William C. Dillon, Susan Hansen,
and Class Plaintiffs

Thomas J. O'Brien
Galfand, Berger, Lurie, Brigham,
 Jacobs, Swan & Jurewicz
1818 Market Street, Suite 2300
Philadelphia, PA 19103

Attorneys for Appellant
Philadelphia Area Project on
Occupational Safety and Health

Linda M. Martin
Ralph Teti
Willig, Williams & Davidson
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103

Attorneys for Appellant/Intervenor
The Philadelphia Federation of
Teachers Local 3, AFL-CIO

3

D. Michael Fisher
Attorney General
Susan J. Forney (Argued)
Senior Deputy Attorney General
Calvin R. Koons
Senior Deputy Attorney General
John G. Knorr, III
Chief Deputy Attorney General
Chief, Litigation Section
Office of the Attorney General
 of Pennsylvania
Department of Justice
Strawberry Square, 15th Floor
Harrisburg, PA 17120

Attorneys for Appellees
Robert Barnett, Secretary of Labor
and Industry for the Commonwealth
of Pennsylvania; Frank Beal, Director
of the Pennsylvania Bureau of
Workers Compensation; Constance B.
Foster, Insurance Commissioner for
the Commonwealth of Pennsylvania;
Catherine Baker Knoll, Treasurer,
Commonwealth of Pennsylvania;
John P. O'Malley, Director, State
Workers' Insurance Fund; Johnny
Butler, Secretary of Labor and
Industry of the Commonwealth of
Pennsylvania; Richard A. Himler,
Director of the Pennsylvania Bureau
of Workers Compensation

4

Arthur Makadon
Robert McL. Boote (Argued)
Burt M. Rublin
Cecelia E. Henry
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599

Attorneys for Appellees
American Manufacturers Mutual
Insurance Company, CIGNA
Corporation, Continental Casualty
Company, USF&G Insurance
Company, Zurich American Insurance
Company, Commonwealth Union
Insurance Company

Patricia F. Kerelo
Jan M. Ritchie
Schubert, Bellwoar, Cahill & Quinn
1400 Two Penn Center Plaza
Philadelphia, PA 19102-1890

Stephen J. Springer
Jeffrey D. Hutton
Rawle & Henderson
One South Penn Square
The Widener Building
Philadelphia, PA 19107

Pamela Tobin
Labrum and Doak
1818 Market Street, Suite 2900
Philadelphia, PA 19103

Attorneys for Appellee,
School District of Philadelphia

Robert E. Kelly, Jr.
Duane, Morris & Heckscher
305 North Front Street
P.O. Box 1003
Harrisburg, PA 17108-1003

Attorneys for Appellee Donegal
Mutual Insurance Company

Mark F. Horning
Shannen W. Coffin
Steptoe & Johnson, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Craig A. Berrington
Bruce C. Wood
American Insurance Association
1130 Connecticut Avenue, N.W.
Washington, D.C. 20036

Attorneys for Amicus Curiae
American Insurance Association

Michael W. Jones, Esq.
Michael I. Levin & Associates
1800 Byberry Road
1402 Masons Mill Business Park
Huntingdon Valley, PA 19006

Attorneys for Amici Curiae School
Boards Association Insurance Trust
and Pennsylvania Pooled Risk
Insurance for Municipal Entities
Workers' Compensation Trust

OPINION OF THE COURT

GARTH, Circuit Judge:

The issue we must address on this appeal is whether Pennsylvania's Workers' Compensation Act, 77 Pa. Const. Stat. Ann. S 531(5) and (6) (West Supp. 1997), which provides for the supersedeas of an employee's medical benefits without prior notice or an opportunity to be heard, violates the requisites of procedural due process. We hold that it does. Accordingly, we reverse.

I.

The Pennsylvania Workmen's Compensation Act ("the Act"), 77 Pa. Const. Stat. Ann. S 1 et seq., establishes a

6

compulsory insurance system for employers that provides compensation to employees who sustain work-related injuries and occupational diseases without regard to an employee's negligence. See 77 Pa. Const. Stat. Ann. S 431. To guarantee the payment of an employee's claims, the Act requires employers to obtain insurance -- either through a private insurance carrier or through the State Workmen's Insurance Fund ("SWIF") -- or to self-insure. See id. S 501. When an employer purchases insurance, the insurance company assumes the employer's statutory liabilities. See id. SS 501, 701.

On July 2, 1993, the Pennsylvania legislature amended the Act by enacting Act 44. The purpose of Act 44 was to contain the spiraling costs of medical treatment for work-related injuries. Codified at 77 Pa. Const. Stat. Ann. S 531(5) and (6), Act 44 created a utilization review process under which the reasonableness and/or necessity of an employee's medical treatment could be reviewed. It is these provisions of Act 44 which create the utilization review process and the corresponding supersedeas that are challenged in this action. Utilization review is a process whereby medical providers assess the reasonableness or necessity of current, prospective, or past medical treatment.

Section 531(5) provides the mechanism by which utilization review is invoked. It states in pertinent part:

> The employer or insurer shall make payment and providers shall submit bills and records in accordance with the provisions of this section. All payments to providers for treatment provided pursuant to this act shall be made within thirty (30) days of receipt of such bills and records unless the employer or insurer disputes the reasonableness or necessity of the treatment provided pursuant to paragraph (6) . . . .

77 Pa. Const. Stat. Ann. S 531(5) (West 1997) (emphasis added). Hence, an employer or insurer must pay an employee's medical expenses within thirty (30) days of receipt of the medical bills unless the employer or insurer requests utilization review. The decision to invoke utilization review is made independently by the employer or insurer.

7

A.

Section 531(6) outlines the utilization review process. Section 531(6) provides:

. . . disputes as to reasonableness or necessity of treatment by a health care provider shall be resolved in accordance with the following provisions:

(I) The reasonableness or necessity of all treatment provided by a health care provider under this act may be subject to prospective, concurrent or retrospective utilization review at the request of an employe[sic], employer or insurer. The department shall authorize utilization review organizations to perform utilization review under this act. Utilization review of all treatment rendered by a health care provider shall be performed by a provider licensed in the same profession and having the same or similar specialty as that of the provider of the treatment under review. Organizations not authorized by the department may not engage in such utilization review.

(ii) The utilization review organization shall issue a written report of its findings and conclusions within thirty (30) days of a request.

(iii) The employer or the insurer shall pay the cost of the utilization review.

(iv) If the provider, employer, employe [sic] or insurer disagrees with the finding of the utilization review organization, a petition for review by the department must be filed within thirty (30) days after receipt of the report. The department shall assign the petition to a workers' compensation judge for a hearing or for an informal conference under [77 Pa. Const. Stat. Ann. S 711.1]. The utilization review report shall be part of the record before the workers' compensation judge. The workers' compensation judge shall consider the utilization review report as evidence but shall not be bound by the report.

77 Pa. Const. Stat. Ann. S 531(6).

Thus, utilization review is invoked when an employee,

8

employer, or insurer requests review of specific medical treatment performed.1 The party seeking review submits its request to the Bureau of Workers' Compensation ("the Bureau") on a Bureau-prescribed form entitled "Utilization Review: Initial Request" ("Initial Request"). The Bureau reviews the Initial Request to ensure that it is properly completed -- i.e., that all information required by the form is provided. See 34 Pa. Code S 127.452. The Bureau's review of the Initial Request does not address the legitimacy or lack thereof of the request for utilization review.

If the Initial Request is improperly completed (i.e., does not provide all pertinent information requested by the form), the Bureau denies the request for review and sends the form back to the party. If the Initial Request is completed properly, the request is approved and the party requesting review must serve a copy of the Initial Request upon the remaining interested parties, including the employee, the employer, the insurer, and the health care provider, as appropriate. See 34 Pa. Code S 127.452.

At this point, according to the Act's regulations, an employer or insurer with a Bureau-approved request may suspend payment for the medical treatment in question. See id. S 127.208.2 The Act does not require -- but permits -- suspension of medical benefits. In addition, medical

_____

1. An employee is not likely to request utilization review, however, because the invocation of that process can result in the termination of the employee's medical benefits pending such review.

2. Section 127.208 of the regulations pertinent to the Act provides in part:

> (e) The 30-day period in which payment shall be made to the provider may be tolled only if review of the reasonableness or necessity of the treatment is requested during the 30-day period under the UR provisions . . . . The insurer's right to suspend payment shall continue throughout both the initial review and the reconsideration review of the UR process. The insurer's right to suspend payment shall further continue beyond the UR process to a proceeding before a Workers' Compensation judge, unless there is a UR determination made at reconsideration that the treatment is reasonable or necessary.

34 Pa. Code S 127.208(e) (1996).

9

providers are not forbidden from continuing to furnish medical services to employees who are subjected to such review, although any such treatment is rendered with the risk that the medical provider ultimately may not be compensated depending upon the resolution of the utilization review. Furthermore, although the employee is given notice that the Initial Request for utilization review has been filed, there is no indication on that form that an employee's medical benefits may be terminated for and during the disputed treatment. Further, the Initial Request does not provide any information or explanation regarding what utilization review entails.

After a request for review is properly filed, the Bureau randomly assigns the case to a Utilization Review Organization ("URO"),3 and the Bureau again notifies all interested parties that the case has been assigned by sending out a Notice of Assignment form. See 34 Pa. Code S 127.453. The Notice of Assignment is a copy of the notice that is sent to the URO, advising the URO that a particular case has been assigned to it. The Notice of Assignment, like the Initial Request, does not inform employees that their medical benefits may be suspended nor does it advise employees of procedures under which their suspension may be protested.

The review process is narrowly tailored to the task of determining whether specific medical treatment is or was reasonable or necessary. Utilization review is conducted by a health care provider4 who has "the same or similar

_____

3. "Utilization Review Organizations" are defined as

     those organizations consisting of an impartial physician, surgeon or
     other health care provider or a panel of such professionals and
     provides as authorized . . . for the purpose of reviewing the
     reasonableness and necessity of a health care provider pursuant to
     section 531(6).

77 Pa. Const. Stat. Ann. S 29 (West 1997).

4. A "health care provider" is defined as

     any person, corporation, facility or institution licensed or otherwise
     authorized by the Commonwealth to provide health care services,
     including, but not limited to, any physician, coordinated care

specialty" as the provider who conducted the treatment in question. See 77 Pa. Const. Stat. Ann. S 531(6)(i). Accordingly, the reviewer must apply generally accepted treatment protocols to assess the reasonableness or necessity of the questioned treatment. See 34 Pa. Code S 127.467. The URO may not request, seek, or obtain independent medical examinations or reports. See id. S 127.461. Rather, the review is solely based upon the medical records of the treating medical provider and any discussions that the URO has had with the medical provider concerning the treatment. See id. SS 127.461, 127.469.5 Lastly, the URO's role is narrowly defined to address exclusively whether the medical treatment in question is reasonable and/or necessary. See 34 Pa. Code S 127.470.

The URO must assume that the employee's medical condition is a work-related injury. See id. In addition, the URO does not consider whether the employee is still disabled, whether the employee has obtained maximum medical improvement, or whether the fees charged are reasonable. As noted, the URO's exclusive function is to determine the reasonableness or necessity of the prescribed treatment in question.

The URO must issue a report of its findings and conclusions within thirty (30) days of a request. 6 See 77 Pa.
_____

        organization, hospital, health care facility, dentist, nurse,
        optometrist, podiatrist, physical therapist, psychologist,
chiropractor
        or pharmacist and an officer, employe [sic] or agent of such person
        acting in the course and scope of employment or agency related to
        health care services.

77 Pa. Const. Stat. Ann. S 29.

5. The URO must give the treating medical provider an opportunity to discuss the challenged treatment. See 34 Pa. Code S 127.469. Neither the statute nor the regulations make any provision for giving the affected employee the same opportunity.

6. The regulations provide that the URO must complete the review and make a determination within thirty (30) days of receiving the medical provider's records or within thirty-five (35) days of the date that the URO
received the Notice of Assignment, whichever is earlier. See 34 Pa. Code S 127.465.

11

Const. Stat. Ann. S 531(6)(ii). The written report must contain findings, conclusions, and citations to generally accepted treatment protocols and medical literature, as appropriate. See 34 Pa. Code S 127.472. The URO sends the report to the Bureau which then sends a copy to all interested parties. See id. S 127.476. The employer or insurer pays for the initial utilization review. See 77 Pa. Const. Stat. Ann. S 531(6)(iii); 34 Pa. CodeS 127.477.

B.

Originally, Act 44 permitted reconsideration of the URO's determination if filed within thirty (30) days of the URO's report. See 77 Pa. Const. Stat. Ann. S 531(6)(iv). The review on reconsideration mirrored the initial utilization review except that a different URO conducted the review and the Bureau advanced the costs of reconsideration and subsequently billed the losing party. See 34 Pa. Code S 127.514. Thus, as with the utilization review, an employee could not testify before a URO concerning the medical treatment on reconsideration. Further, parties were not notified before invoking reconsideration review that they would be billed for the costs of reconsideration review if they lost.

If a party disagreed with the URO's determination on reconsideration, it could file a Petition for Review with the Bureau for de novo review before a Workers' Compensation Administrative Law Judge ("ALJ"). If the employee prevailed upon reconsideration, the supersedeas was lifted pending this de novo hearing. If the employee lost the reconsideration review, the supersedeas remained in effect. See id. S 127.208(f).

Even if the medical services provided were ultimately found to be reasonable and/or necessary, an employee's benefits could be suspended for a considerable length of time pending the initial utilization review, reconsideration, and de novo review by an ALJ. While the Act requires the initial utilization review to occur within thirty (30) days of a request, see 77 Pa. Const. Stat. Ann. S 531(5)(ii), and reconsideration to be filed within thirty (30) days of the URO's determination and decided within 30-35 days

12

thereafter, see 34 Pa. Code S 127.508, there is no time-frame specified for adjudication and resolution before the ALJ. Accordingly, employees could have waited months or even years without medical benefits before the reasonableness or necessity of their treatment was resolved.

In 1996, the Act was amended yet again by Act 57. Act 57 streamlined the utilization review process by eliminating the reconsideration process, thereby allowing for faster de novo review by an ALJ. Thus, after the initial URO issues its decision, the losing party no longer need seek reconsideration by another URO, but rather may petition for de novo review by an ALJ. Under Act 57, if the initial URO rules in favor of the employee, the supersedeas is lifted pending the ALJ's review. If the URO rules against the employee, the supersedeas remains in effect until after the ALJ renders his/her decision. See id. S 127.208(e). In all other material respects the provisions of Act 44 remained in effect and are not challenged here.

II.

The Plaintiffs (hereinafter, collectively "Sullivan") in the present S 1983 case are ten individual employees[7] and two organizations representing employees who claim that their medical benefits were suspended without regard to due process: the Philadelphia Area Project on Occupational Safety and Health ("PhilaPOSH"),[8] and the Philadelphia Federation of Teachers ("PFT").[9] Sullivan claims that the amendments to the Act violated the Plaintiffs' constitutional right to due process under the Fourteenth Amendment by

_____

7. The Plaintiffs-Appellants are Delores Scott Sullivan, William Battle, Louis Baumgartner, Anthony Cancila, William C. Dillon, Terrence Ervine, Charles Matthews, Christopher Costello, Lisa Lex, and Susan Hansen.

8. PhilaPOSH is a non-profit organization comprised of over 2000 unions and individual members, representing approximately 300,000 workers in Southeastern Pennsylvania. PhilaPOSH advocates for occupational safety and the rights of injured workers. Plaintiffs alleged that several members of PhilaPOSH had been directly affected by the utilization review procedures challenged in this litigation. See Am. Compl. at P 15.

9. In its order dated March 30, 1995, the district court permitted the PFT to intervene as a plaintiff in this action.

permitting their employers and/or insurers to suspend the payment of their workers' compensation medical benefits without prior notice and without affording them an opportunity to be heard.10 Sullivan filed the amended complaint in this action on May 21, 1996, three months before the amendments in Act 57 rescinding reconsideration review took effect.

The Defendants in this action include various state officials responsible for administering the Act ("the Commonwealth Defendants"),11 the director of SWIF,12 the School District of Philadelphia ("the School District"), and several insurance companies.13

The insurance company defendants and the School District moved to dismiss the complaint on the grounds that there was no state action involved in suspending Sullivan's medical benefits.14 Sullivan filed a motion for partial summary judgment on the issue that the insurers

_____

10. The Fourteenth Amendment provides, in pertinent part:

        Section 1. All persons born or naturalized in the United States, and
        subject to the jurisdiction thereof, are citizens of the United States
        and the State wherein they reside. No State shall make or enforce
        any law which shall abridge the privileges or immunities of citizens
        of the United States; nor shall any State deprive any person of life,
        liberty, or property, without due process of law; nor deny to any
        person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, S 1.

11. The state officials are the Secretary of Labor and Industry, Robert Barnett (Appellees name Johnny Butler in this position); Director of Pennsylvania's Bureau of Workers' Compensation, Richard Himler; Insurance Commissioner for the Commonwealth of Pennsylvania, Linda Kaiser; and Treasurer for the Commonwealth, Catherine Baker Knoll.

12. The Director of SWIF is Ralph Chase.

13. The insurance companies involved in this action are American Manufacturer's Mutual Insurance Company, Cigna Corporation, Continental Casualty Company, USF&G Insurance Company, and Zurich American Insurance Company.

14. The insurance company defendants contended that there was no state action with respect to the private decisions that they made. The

School District claimed that there was no state action because it did not participate in the decision-making process concerning the invocation of utilization review (and corresponding termination of medical benefits) because it contracted out the payment of its medical liabilities under the Act to a private company which is not a party to the present action. See Sch. Dist.'s Mem. in Supp. Mot. to Dismiss at 1-4 (district court docket # 11, 12).

14

and the School District were state actors subject to the constraints of due process. In its opinion and order dated January 24, 1996, the district court ruled that the private insurers were not state actors, but at that time did not decide the state action issue with respect to the School District as the record was incomplete and more discovery was needed. See Sullivan v. Barnett, 913 F. Supp. 895 (E.D. Pa. 1996) (hereinafter, "Sullivan I").

On May 28, 1996, Sullivan moved for class certification to represent the class of workers who have had or will have their medical benefits suspended under Pennsylvania's utilization review procedures without advance notice or an opportunity to be heard prior to supersedeas of benefits under section 531(5) and (6). See Am. Compl. at P 17. Holding that the supersedeas provisions did not offend due process, the district court dismissed the complaint with respect to the Commonwealth Defendants and the School District by orders dated November 7, 1996, see Sullivan v. Butler, 1996 WL 654032 (E.D. Pa. Nov. 7, 1996) (hereinafter, "Sullivan II"), and December 13, 1996, respectively, without certifying the plaintiff-class. This appeal followed.

We have jurisdiction over this appeal pursuant to 28 U.S.C. S 1291. Our review over the district court's rulings is plenary. See Weiner v. The Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997).

III.

In order for Sullivan to prevail on her claims that the Act does not provide adequate notice nor an opportunity to be heard before her benefits are terminated, the Defendants must be held to be state actors or to be acting under color of state law.15

_____

15. Section 1983 provides a cause of action to individuals who have been deprived of a federal right by a person acting "under color of state law." See Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). The "under color of state law" requirement ofS 1983 and the "state action" element of the Fourteenth Amendment have been interpreted to be "identical in most contexts," Id. at 639 n.15; see also Lugar, 457 U.S.

15

The Commonwealth does not dispute that it is a state actor, and indeed, it would be hard-pressed to do so in light of the fact that it was the Commonwealth that enacted the supersedeas provisions of 77 Pa. Const. Stat. Ann. S 531(5) and (6) which deprive Sullivan of the Workers' Compensation medical benefits to which she is entitled. Nor has SWIF disputed the fact that it is a state actor. See Commonwealth Br. at 20 n.12; see also Rumph v. State Workmen's Ins. Fund, 964 F. Supp. (E.D. Pa. 1997); Baksalary v. Smith, 579 F. Supp. 218, 230 (E.D. Pa. 1984). Further, the School District apparently does not now contest that it is a state actor, as it has not briefed the issue on appeal.16 The insurers, however, deny that their actions in invoking relief under the supersedeas provisions appurtenant to the utilization review process constitute state action. We cannot agree.

State action has been characterized as one of the most troublesome issues of constitutional law. See Henry C. Strickland, The State Action Doctrine and the Rehnquist Court, 18 Hastings Const. L.Q. 587, 588 (1991). Various cases have led to differing results in factual scenarios that, at least upon first impression, appear to be similar. Compare Mark v. Borough of Hatboro, 51 F.3d 1137 (3d Cir. 1995) (concluding that state action existed in context of volunteer fire department), with Groman v. Township of Manalapan, 47 F.3d 628 (3d Cir. 1995) (holding that state action did not attach to actions of a volunteer first aid

_____

at 935 n.18. Thus, private parties can be held liable for the alleged due process violations only if "it can be fairly said that the [government] is responsible for the specific conduct of which the plaintiff complains" -- here, the suspension of employees' Workers' Compensation medical benefits. Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632 (1991) (O'Connor, J. dissenting) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004) (1982).

16. In Sullivan I, the district court initially denied the School District's
motion to dismiss premised upon the state action issue. See Sullivan I, 913 F. Supp. at 905. However, because the district court held that the supersedeas provisions of the Act did not violate procedural due process in Sullivan II, the district court did not ultimately find it necessary to reach the state action issue with respect to the School District.

squad). Indeed, the state action inquiry necessarily depends upon the factual contexts in which the controversies arise. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1982); Jackson v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961) ("Only by sifting through facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."); Groman, 47 F.3d at 639 n.16. To compound the confusion surrounding a state action examination, courts have employed various tests and standards that have been anything but a model of clarity. See Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632 (1991) (O'Connor, J. dissenting) ("Unfortunately, [Supreme Court] cases deciding when private action might be deemed that of the state have not been a model of consistency.").

In order to analyze the state action issue before us, it is critical to place the insurer's role within the Workers' Compensation system in its proper context. The Act provides no-fault compensation to all employees within the Commonwealth for all injuries sustained during the course of one's employment. In exchange for this guarantee of automatic compensation for wage loss and medical costs without regard to proof or fault, employees lost their right to sue their employers in tort. See Winterberg v. Transportation Ins. Co., 72 F.3d 318 (3d Cir. 1995). The Act abolishes an employer's common law defenses and strips an employee of his/her right to sue upon common law causes of action. Thus, the Workmen's Compensation scheme in Pennsylvania has been held to be the exclusive remedy available to an injured worker. See 77 Pa. Const. Stat. Ann. S 481(a).17 Cf. Travelers Indemnity Co. v. DiBartolo, 131 F.3d 343, 350-51 (3d Cir. 1997) (holding an employer's voluntary purchase of uninsured motorist coverage is a fringe benefit since it is no longer mandated

_____

17. 77 Pa. Const. Stat. Ann. S 481(a) states, in pertinent part:

       The liability of an employer under this act shall be exclusive and in
       the place of any and all other liability to such employes [sic] . . . or
       anyone otherwise entitled to damages in any action at law or
       otherwise on account of any injury or death . . . .

77 Pa. Const. Stat. Ann. S 481(a) (West 1992).

by state law and, thus, is not subject to the exclusivity provision of the Workmen's Compensation Act). The system is mandatory; an employee cannot opt-out of Pennsylvania Workers' Compensation scheme. See 77 Pa. Const. Stat. Ann. S 461 (historical notes).

The benefits provided to employees under the Act are a constitutionally protected entitlement. None of the parties disputes this. See, e.g., Sullivan II at 4; see also Baksalary, 579 F. Supp. at 224-225. The Commonwealth has created this entitlement, and the Commonwealth guarantees that these benefits will be paid to an injured employee.[18]

In creating and executing this system of entitlements, the Commonwealth has enacted a complex and interwoven regulatory web enlisting the Bureau, the employers, and the insurance companies. The Commonwealth extensively regulates and controls the Workers' Compensation system. Although the insurance companies are private entities, when they act under the construct of the Workers' Compensation system, they are providing public benefits which honor State entitlements. In effect, they become an arm of the State, fulfilling a uniquely governmental obligation under an entirely state-created, self-contained public benefit system. It is a "system which the government alone administers." Edmonson, 500 U.S. at 622. Thus, we conclude the insurance companies are a partner or an arm of the State in implementing legislation that administers constitutionally protected entitlements which the Commonwealth has enacted as a matter of policy.

The right to invoke the supersedeas, or to stop payments, is a power that traditionally was held in the hands of the State. When insurance companies invoke the supersedeas (i.e., suspension) of an employee's medical benefits, they compromise an employee's State-created entitlements. The

_____

18. The Commonwealth guarantees that Workmen's Compensation benefits will be paid by imposing a statutory obligation upon the employer to pay for all work-related injuries of his/her employees. If the employer's insurance company becomes insolvent, however, the Workers' Compensation Security Fund, a fund administered and created by the Commonwealth, assumes the responsibility of paying the benefits to eligible employees. See 77 Pa. Const. Stat. Ann. S 1053.

18

insurers have no power to deprive or terminate such benefits without the permission and participation of the Commonwealth. More importantly, however, the Commonwealth is intimately involved in any decision by an insurer to terminate an employee's constitutionally protected benefits because an insurer cannot suspend medical payments without first obtaining authorization from the Bureau. However this authorization may be characterized, any deprivation that occurs is predicated upon the State's involvement.

There is little difference between the approval required here and that necessary for utilizing a peremptory challenge, see, e.g., Edmonson, 500 U.S. at 622, or for employing a nonclaim statute with the assistance of the probate court. See, e.g., Tulsa Prof 'l Collection Serv. v. Pope, 485 U.S. 478 (1988). "The [Bureau] is intimately involved throughout, and without that involvement" the supersedeas could not operate. Id. at 487. Further, the supersedeas lacks the self-executing characteristic that might otherwise render due process concerns irrelevant. To the contrary, the supersedeas provisions at issue are not self-executing, and without the Commonwealth's involvement and approval, the insurance companies would be precluded from suspending medical benefit payments -- an aspect of the Workmen's Compensation procedure which they had desired. Accordingly, we hold that the private insurance companies are state actors when they invoke the supersedeas provisions under S 531(5) and (6).

Our decision is consistent with West v. Atkins , 487 U.S. 42 (1988). There, the Court held that a private physician under contract with the State of North Carolina to provide medical services to prison inmates acted under color of state law even though the doctor was not directly employed by the State. In West, the State was under an affirmative obligation to provide medical care to inmates. The State delegated that responsibility to a part-time contract physician, who assumed the State's obligation. Under these circumstances, the Court held that state action attached to the actions of the private doctor such that the prisoner could maintain a S 1983 cause of action against the doctor.

19

That the doctor exercised professional judgment and discretion independent of the State was insufficient to relieve him of his constitutional obligations. See id. at 52. The Court emphasized that "[i]t is the physician's function within the state system, not the precise terms of his employment, that determines whether his action can fairly be attributed to the State." Id. at 55-56. "[T]he dispositive issue concerns the relationship among the State, the physician, and the prisoner." Id. at 56 (emphasis added).

Similarly, in this case, examining the relationship among the Commonwealth, employer, and the insurance companies, we have concluded that the actions of the insurers constitute state action. The employers are under an affirmative obligation to insure their employees for work-related accidents. This obligation is expressly assumed by the insurance companies when an employer purchases insurance, see 77 Pa. Const. Stat. Ann. SS 501, 701, and is assumed by the Commonwealth if and when a insurer becomes insolvent.19 Like the constitutional right involved in West, the employees under the Act have a constitutionally protected entitlement in receiving their Workers' Compensation medical benefits. In addition, like the prisoner in West, the employees cannot elect to go outside the system for medical treatment. Like prisoners, they are locked into the system, and any relief that the employees obtain is strictly through the program which the State has designed. The employees are, in essence, prisoners -- albeit beneficiaries -- of the Commonwealth's Workers' Compensation system.

Our conclusion is also consistent with the decision of the three-judge district court panel which convened in Baksalary v. Smith,20 579 F. Supp. 218 (E.D. Pa. 1984),

_____

19. See supra note 17.

20. In Baksalary, a three-judge panel of the district court comprised of two district court judges and one Court of Appeals judge, convened pursuant to 28 U.S.C. S 2284. In Baksalary, employees contested an automatic supersedeas provision under the Act that terminated an employee's benefits without notice or a pre-termination opportunity to be heard. If an employer or insurer filed a petition which alleged that an employee had returned to work at the same or higher rate of pay, or if the petition -- accompanied by a physician's affidavit -- alleged that the employee had recovered from his/her disability, then the employer or insurer could terminate the employee's Workers' Compensation benefits. See Baksalary, 579 F. Supp. at 221.

which held that the state action mantle falls upon the insurers. Baksalary involved a similar challenge to the Act, held that the insurers acted under color of state law, and accordingly found that there had been a denial of due process in violation of the Fourteenth Amendment from the invocation of section 413, 77 Pa. Const. Stat. Ann.S 774, a similar supersedeas provision.

We are aware that Baksalary has been criticized by the Fifth Circuit in Barnes v. Legman, 861 F.2d 1383 (8th Cir. 1988), but we do not share the Fifth Circuit's view. Barnes concerned a due process challenge to a provision in Texas' Workers' Compensation Statute that permitted an insurance carrier to terminate medical benefits based upon a medical report. As the Barnes decision is predicated upon its interpretation of Texas -- as distinct from Pennsylvania -- law, it is necessarily inapposite to this case. The Barnes court did not explain in detail the procedural involvement of Texas in permitting the insurance company to deny an employee his/her benefits. Clearly, however, the statutory provision permitting the termination of benefits in Barnes and the supersedeas provisions at issue here vary significantly. In Barnes, for instance, the insurance company was not compelled to resume the employee's benefits even after a State officer reviewing the case recommended that the insurance company reinstate those benefits. See Barnes, 861 F.2d at 1384. Thus, the employee was left with a cause of action under state law only.

In addition, it is unclear whether employers and/or employees can opt-out of Texas' Workers' Compensation scheme. In Pennsylvania, as we have stated, they cannot. Moreover, and perhaps most importantly, it is not clear that under Texas law that State involvement was required prior to the termination of benefits. See Tex. Workers' Compensation Law, art. 8307 S 11 (repealed 1989).21

_____

21. Article 8307, S 11, provides:

> Association suspending payments. When the association suspends or stops payment of compensation, it shall immediately notify the board of that fact, giving the board the name, number and style of the claim, the amount paid thereon, the date of the suspension or stopping of payment thereon, and the reason for such suspension or stopping.

Tex. Workers' Compensation Law, art. 8307, S 11 (repealed 1989).

Nor do we find other state action authorities to be persuasive in analyzing the context of Pennsylvania's Workmen's Compensation statutory scheme. As we have previously observed, the factual context in which the particular issue arises must be the focus of a state action inquiry. Other cases cited by the insurers such as Blum v. Yaretsky, 457 U.S. 991 (1982) (finding no state action when private nursing homes decided to transfer or discharge Medicaid patients without notice or a hearing), Rendell–Baker v. Kohn, 457 U.S. 830 (1982) (finding no state action when private school fired employees despite the fact that school was financed from almost exclusively public sources and was extensively regulated by government), Flagg Brothers v. Brooks, 436 U.S. 149 (1978) (finding no state action when private warehouseman invoked self–help provisions of New York's Uniform Commercial Code by selling goods entrusted to him), and Jackson v. Metropolitan Edison Company, 419 U.S. 345 (1974) (finding no state action when privately owned electric utility terminated a customer's electric service for nonpayment without a hearing), do not, by the very nature of the controversies with which they dealt, involve a comprehensive statutory scheme similar to that present in this case.

We therefore conclude that, in the present context of a comprehensive state scheme reflected in the Workers' Compensation statute of Pennsylvania, the private insurers are state actors. The Act mandates compliance by employers, employees, and insurance companies and inextricably entangles the insurance companies in a partnership with the Commonwealth such that they become an integral part of the state in administering the statutory scheme. This relationship more than suffices to satisfy the constitutional requisites under the tests –– varied though they may be –– for state action. See Blum, 457 U.S. at 1004 (state action exists if the State has coerced the action or provided significant encouragement); Rendell–Baker, 457 U.S. at 842 (state action exists if there is a symbiotic relationship between the state and the private actor); Flagg Bros., 436 U.S. at 157–59 (state action exists if private actor exercises powers exclusively within the prerogative of the State); Jackson, 419 U.S. at 351 (state action exists if a sufficiently close nexus between State and private actor is

found); Mark, 51 F.3d at 1156 (suggesting courts should employ a totality of circumstances approach to state action inquiries) (Greenberg, J. concurring). We expressly limit our holding here today, however, to the unique context in which the instant supersedeas provisions arise.22

IV.

We now address the due process issue that is at the heart of the instant action.

The gravamen of Sullivan's complaint is that the lack of notice afforded under the supersedeas provisions, S 531(5) and (6), of the Act violates the procedural due process guarantees under the Fourteenth Amendment because neither the Initial Request for utilization review nor the Notice of Assignment specifically informs an employee that the insurer or employer can stop paying for the contested medical treatments pending review.23 Although employees are notified that their employers or insurers have invoked the utilization review process pursuant to 34 Pa. Code S 127.452, or are notified that the case has been assigned for review to a URO, pursuant to 34 Pa. Code S 127.453(b), Sullivan points out that such notification does not provide any information or explanation concerning what the utilization review process involves. Sullivan also contends that neither notification provides any information about

_____

22. In light of our holding that the private insurance companies are state actors and are thus bound by the constraints of due process, we need not address the question as to whether a disparate classification concerning a public insurer, such as SWIF, and the private insurers would violate the Equal Protection Clause of the Fourteenth Amendment.

23. Neither party disputes the district court's ruling that Workers' Compensation benefits are a constitutionally protected property interest subject to scrutiny under the Due Process Clause of the Fourteenth Amendment. See, e.g., Sullivan II at 4; see also Baksalary v. Smith, 579 F. Supp. 218, 224-25 (E.D. Pa. 1984) ("We find that when an individual must forego the use of his [workers'] compensation benefits for as long as one year . . . that individual has undergone the deprivation of a constitutionally protected property interest."). Accordingly, we concentrate upon whether the procedures afforded to employees under the Act comport with the strictures of due process.

23

how an employee can contest the underlying allegations that serve the basis for the utilization review. Accordingly, Sullivan argues that such notification is defective because (1) the employee receives no notice that his/her benefits may cease pending review, (2) the employee receives no meaningful notice prior to the deprivation, and (3) the employee is not advised of the procedures under which he/she can protest the imminent deprivation.

The Bureau does not dispute that no notice is provided to an employee that his/her medical benefits might be suspended. Rather, the Bureau contends that the decision to discontinue such benefits (i.e., request a supersedeas) is discretionary and is determined solely by the employer or the insurer, not the Bureau. Thus, the Bureau maintains that it does not have information regarding the status of an employees' medical benefits in a utilization review case, and accordingly it does not deny employees of procedural due process by failing to notify them of such information. The Bureau further asserts that this case is not akin to Goldberg v. Kelly, 397 U.S. 306, 314 (1970), 24 such that a pre-deprivation hearing is required prior to the suspension of medical benefits. As a result, the Bureau maintains that sufficient process is afforded to employees under the Act.

"The core of due process is the right to notice and a meaningful opportunity to be heard." LaChance v. Erickson, ___ U.S. ___, 1998 WL 17107 (1998) at 3; see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985); Memphis Light, Gas & Water Div. v. Craft , 436 U.S. 1, 13 (1978); Fuentes v. Shevin, 407 U.S. 67, 80 (1972); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). We will thus address the constitutionality of the pre-deprivation notice the employees receive in this case and their opportunity to be heard, in turn.

A. Notice

"[A]dequate notice detailing the reasons for a proposed termination" of a constitutionally protected liberty or

_____

24. In Goldberg v. Kelly, the Supreme Court held that a pre-deprivation evidentiary hearing was required prior to the termination of welfare benefits.

property interest must be afforded to individuals prior to the deprivation. Goldberg v. Kelly, 397 U.S. 254, 267–68 (1970). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane, 339 U.S. at 314. The level of notice required before an individual is deprived of a constitutionally protected property interest depends upon the particular benefits at issue. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

In Memphis Light, Gas & Water Division, the Supreme Court held that a Memphis utility company did not provide constitutionally sufficient notice to its customers prior to terminating their utilities. Although the utility gave its customers notice that their service could be terminated for nonpayment of their bill, the company failed to inform its patrons of how they could protest or object to charges on their bills. The Court concluded that "[n]otice in a case of this kind does not comport with constitutional requirements when it does not advise the customer of the availability of a procedure for protesting a proposed termination . . . as unjustified." 436 U.S. at 14–15 (emphasis added).

In Goldberg v. Kelly, the Court considered whether the notice provisions of New York City's welfare termination process comported with due process. As welfare recipients were given seven days advance notice of the impending termination, a letter informing them of the precise questions raised about their continued eligibility and the legal and factual bases for the Department of Social Services' doubts, and a personal conference explaining the same, the Court held that the notice provisions were adequate. See 397 U.S. at 268. Similarly, although notice was not directly at issue in Mathews v. Eldridge, 424 U.S. 319, 324 (1976), the Court acknowledged that recipients of Social Security disability payments were afforded proper notice which included a letter informing them that their benefits would be terminated prior to the deprivation, a detailed explanation of the reasons for the proposed

25

termination, and the opportunity to submit additional evidence to the agency making the determination prior to the actual deprivation.

Moreover, we held in Ortiz v. Eichler, 794 F.2d 889 (3d Cir. 1986), that the notice provided by Delaware prior to the termination or denial of Aid to Families with Dependent Children, Food Stamps, and Medicaid benefits was constitutionally deficient because it failed to explain the reasons for the state agency's action and did not contain the agency's specific calculations utilizing an employee's income or financial resources to ascertain his/her eligibility in making its determination. See id. at 892, 895.

The Supreme Court of Iowa confronted a similar problem to the one at hand when it considered the notice to which an employee was entitled before his/her Workers' Compensation benefits were terminated. There, the Court held that at a minimum due process required the following:

> (1) the contemplated termination,
> (2) that the termination of benefits was to occur at a specified time not less than 30 days after notice,
> (3) the reason or reasons for the termination,
> (4) that the recipient had the opportunity to submit any evidence or documents disputing or contradicting the reasons given for termination, and, if such evidence or documents are submitted, to be advised whether termination is still contemplated,
> (5) that the recipient had the right to petition for review.

Auxier v. Woodward State Hospital-School, 266 N.W.2d 139, 142-43 (Iowa 1978).

Informed by established precedent, we hold that in the case of terminating the medical benefits of a workers' compensation employee, at a minimum due process requires that employees receive notice that includes (1) timely notification that their medical benefits might cease prior to the deprivation, (2) an explanation of the reasons for the proposed termination, (3) an opportunity to respond to the accusations alleged, and (4) information advising

26

them of the availability of the procedures that they may utilize to protest the proposed termination.

In the instant case, the notice that an employee receives prior to the termination of his/her medical benefits is constitutionally inadequate. While the employee is notified by the Initial Request that utilization review has been invoked and the reasons upon which the utilization review is based, the Initial Request does not explain that a supersedeas or suspension of one's medical benefits may result nor does it explain what utilization review entails. In addition, it does not inform an employee of any procedures under which the employee can protest the suspension of the medical benefits or contest the merits on which the proposed deprivation is based.

Similarly, the Notice of Assignment does not cure any of the above notice deficiencies. The Notice of Assignment is, in fact, a copy of the notice to the URO informing the URO that a particular case has been assigned. Like the Initial Request, the Notice of Assignment does not notify an employee that his/her medical benefits may be terminated nor does it advise an employee of any procedures under which such termination may be challenged. Further, by the time the Notice of Assignment is received, the employees' medical benefits may have already been suspended, as the supersedeas can be invoked and thus a suspension of benefits effected upon the proper filing of the utilization review process.

That an employee's medical benefits may be suspended prior to his/her receiving notice of that termination is constitutionally fatal to S 531(5) and (6) under the strictures of the Due Process Clause of the Fourteenth Amendment. See Carey v. Piphus, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property.") (emphasis added). At no time prior to the termination is the employee informed of any procedure under which he/she can dispute the supersedeas. As the employee is not informed of the deprivation of his/her medical benefits prior to its taking effect, inadequate notice effectively strips an employee of

27

his/her ability or opportunity to protest or minimize unjustified deprivations.[25]

In Baksalary v. Smith, 579 F. Supp. 218, 233 (E.D. Pa. 1984), a three-judge panel of the district court held a similar supersedeas provision unconstitutional where it failed to provide notice to the employee until after the benefits had already been terminated. Similarly, we conclude that S 531(5) and (6), the supersedeas provisions pertaining to utilization review of medical benefits, is unconstitutional because it fails to provide employees with adequate pre-termination notice.

Our invalidation of this supersedeas provision of the Act does not thereby annul other provisions of the Act:

> Under Pennsylvania law, separate provisions of a statute are presumed severable, and any particular one will survive a decision voiding another unless it is so interrelated with the void provision or incomplete without it that the legislature could not have intended it to stand alone.

Stoner v. Presbyterian Hosp., 609 F.2d 109, 112 (3d Cir. 1979) (citing 1 Pa. Const. Stat. Ann. S 1925). Thus, under our holding today we do no more than sever the "unless" clause from S 531(5) of the Act. We are thereby left with a statute that reads as follows and that requires employers or insurers to make payments in accordance with the provision of the Act, but that does not give those employers or insurers the discretion or opportunity to invoke the supersedeas of an employee's medical benefits:

> The employer or insurer shall make payment and providers shall submit bills and records in accordance with the provisions of this section. All payments to providers for treatment provided pursuant to this act shall be made within thirty (30) days of receipt of such bills and records.

_____

25. At oral argument, the Commonwealth conceded that no notice was afforded to the employees whose medical benefits were terminated pursuant to the supersedeas provisions at issue here. In addition, the Commonwealth recognized that providing notice would be "easy" to remedy.

28

B. Opportunity to be heard

Due process requires that "an individual be given an opportunity for a hearing before he is deprived of any significant property interest." Boddie v. Connecticut, 401 U.S. 371, 379 (1971) (emphasis in original). The right to be heard " `must be granted at a meaningful time and in a meaningful manner.' " Fuentes, 407 U.S. at 80 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). While it is undisputed that some sort of hearing is required before an individual is finally deprived of a liberty or property interest, due process necessitates some sort of pre-termination opportunity to be heard regarding the basis of the proposed termination. See Loudermill, 470 U.S. at 542 ("Even decisions finding no constitutional violation in termination procedures have relied on the existence of some pre-termination opportunity to respond.") "The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." Id. at 546.

In the case before us, the employees were not given a pre-deprivation opportunity to respond to the proposed termination of their medical benefits. Indeed, as we have discussed above, they were not even given notice of the impending termination. "[The] right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Mullane, 339 U.S. at 314. So, while the Commonwealth's statutory scheme provides that employees be given an opportunity for a post-termination evidentiary hearing in the form of a de novo hearing before an ALJ, we must address what pre-termination opportunity to be heard is required to satisfy the constitutional minimum of due process.

In order to determine the extent of the pre-deprivation process, we must consider and balance the following factors:

> First, the private interest that will be affected by the official action. Second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

29

> substitute safeguards; and, finally, the government's
> interest including the function involved and thefiscal
> and administrative burdens that the additional or
> substitute procedural requirements would entail.

Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976). We will deal with each factor in turn.

(1) Private Interest

The employees' interest is in the uninterrupted payment of their medical benefits pending the final administrative decision on their cases. Sullivan II at 5. As the district court acknowledged, this interest is "without a doubt[,] significant." Id. Without receiving her medical treatments, a concomitant of having her medical benefits paid to her medical provider, Sullivan alleges that she has endured longer periods of disability, unnecessary pain, and functional restriction. See Am. Compl.

Notwithstanding the employees' significant interest, the district court found that these interests were mitigated by several factors. First, the district court noted that, unlike Goldberg, termination of one's medical benefits would not deprive an employee of the very means of his/her subsistence. See Sullivan II at 5. The district court also concluded that the availability of full remedies mitigates the impact of the supersedeas. Id. at 6. For instance, an employee whose medical benefits are reinstated on appeal by an ALJ is entitled to an award of benefits plus ten (10) percent interest. See 77 Pa. Const. Stat. Ann. S 717.1(a) (West Supp. 1997). In addition, the prevailing employee may recover the costs of litigating his/her right to medical benefits. See id. S 996 (West Supp. 1997).

Additionally, the district court noted -- and the Defendants contend -- that the Act does not proscribe a medical provider from continuing to treat an employee during the utilization review process. Sullivan II at 5 n.4. Indeed, in the amended complaint, some of the Plaintiffs admit to receiving some medical treatments although such treatments were undergoing utilization review. See, e.g., App. A-107 (Louis Baumgartner). Further, there is nothing in the statute that requires that an employee's medical benefits be suspended. See Sullivan II at 8.

30

Finally, the Defendants emphasize that this case is unlike Goldberg, Mathews, and other traditional due process cases because the court must not only weigh the private interest of Sullivan against the governmental interest, but must also consider the conflicting private interest of the insurance companies. The insurers have an interest in not paying for unnecessary and/or unreasonable medical treatment. The Defendants argue this interest is significant because once such treatment is paid it cannot be recouped from employees or their medical providers even if the disputed treatment is found to be unreasonable or unnecessary. See Moats v. Workmen's Compensation Appeal Bd., 588 A.2d 116, 118 (1991) ("[T]he employer may not seek reimbursement from the claimant or be relieved of paying past medical bills."). Accordingly, the district court held that "a full evidentiary hearing prior to a possible temporary suspension of benefits is not an indispensable requisite for the process that is due." Sullivan II at 6.

The district court mischaracterized the nature of Sullivan's interest, and in so doing, minimized the severity of the deprivation at issue. The district court apparently viewed the medical benefits as more akin to a pecuniary interest, and not an interest in the relief that the medical treatment provides to injured employees. The remedies that the Act provides to an employee whose medical benefits are unjustly terminated provide merely superficial redress as they focus upon a monetary interest as distinct from a medical interest in one's well-being. Further, as medical benefits are typically terminated upon invocation of utilization review, the employee does not receive any medical treatment pending review and thus there may be no medical costs to reimburse upon a determination that the medical treatments were, in fact, reasonable and necessary. Once the supersedeas is invoked, it can take several months before the URO reaches its decision and -- before the reconsideration process was rescinded-- even longer if reconsideration review was requested. 26 Although a

_____

26. Although the URO is required to render a decision within thirty (30) days of the receipt of the employee's medical records or sixty (60) days from the date of assignment, in the amended complaint, Sullivan alleges

31

monetary award may compensate an individual forfinancial losses, a monetary award cannot be deemed an adequate, effective, or appropriate substitute for relieving an employee's disability or pain. Nor can it be a substitute for necessary medical care. Hence, we are persuaded that the employees' private interest in receiving uninterrupted medical benefits is a weighty and significant factor in the pre-termination calculus.

(2) Risk of Erroneous Deprivation

The district court held that the risk of erroneous deprivation in the instant case was slight. The utilization review process considers only medical reports provided directly by the treating physician and related specifically to certain questioned medical procedures and treatments; no independent medical reports are consulted. The reviewer is a physician in the same profession and with the same specialty as the treating physician, and the reviewer is only permitted to apply generally accepted medical protocols to determine whether the questioned treatment is reasonable or necessary. The district court acknowledged -- and Defendants argue -- that medical reports are unbiased, objective, and trustworthy, and thus, the problems associated with credibility of witnesses are not present such that a pre-deprivation hearing would be helpful. In addition, as reconsideration review has been eliminated by Act 57, an employee can receive a de novo evidentiary hearing before an ALJ more quickly than before. 27 As a result, the district court held that additional safeguards

_____

that this time frame is often not adhered to. See Am. Compl. P 66. The length of the deprivation here further supports our conclusion that the private interests are significant. See Mathews , 424 U.S. at 341 ("the possible length of wrongful deprivation of . . . benefits is an important factor in assessing the impact of official action on the private interests.")(internal quotations and citation omitted); see, e.g., Baksalary, 579 F. Supp at 224 (stating that resolution of case typically took one year or more).

27. Most of the Plaintiffs before us were subjected to the reconsideration review process as the termination of their medical benefits occurred prior to the amendment to the Act. See Am. Compl. PP 102, 105, 129, 163, 181, 198, 216, 254.

were not necessary to protect an injured employee from being deprived of one's constitutionally protected property interest in receiving medical benefits. We disagree.

Contrary to the district court's conclusions, we believe that the risk of erroneous deprivation is significant and that additional safeguards can meaningfully minimize the risk of wrongful termination of one's medical benefits. As we stated above, employees receive no notice that a supersedeas of their medical benefits will likely result upon the invocation of utilization review. They are given no pre-deprivation opportunity to be heard either in writing or in person; they are not advised of how they can protest or dispute the underlying allegations that their medical treatments are unreasonable or unnecessary. Although the employee's physician must be given an opportunity to discuss the employee's treatment, see 34 Pa. Code S 127.469, we are hard-pressed to believe that the portrait of the employee's illness and treatment is complete without a statement or other input from the employee himself.

The district court seems to have equated the teaching of Mathews that an evidentiary hearing is not necessarily required prior to the deprivation of a constitutionally protected interest with the notion that no pre-termination process need be afforded at all. We have come to a different conclusion. Due process dictates that employees have some sort of pre-deprivation opportunity to respond before the supersedeas takes effect so as to guard against an erroneous deprivation of benefits.

(3) Governmental Interest

The governmental interest that must be considered is ensuring that only truly disabled individuals are receiving reasonable and necessary medical treatment. Sullivan II at 8. The government also has an interest in containing the rising costs of medical care and insurance payments. Indeed, cost containment is the purpose behind the supersedeas provisions in question here. Further, the government has an interest in conserving its scarcefiscal and administrative resources, and an increase in pre-deprivation procedures may well be an added burden upon those resources. While we agree that such legitimate

33

interests exist, we are also aware that the government has an interest in not wrongfully depriving medical benefits to disabled individuals and ensuring that employees who reasonably and legitimately need medical care under the Act will continue to receive it. On balance, therefore, we are not convinced that any governmental interest outweighs the private interest we have discussed above and which favors Sullivan. Thus, we conclude that the denial of any pre-deprivation process cannot be sustained.

C. What Process is Due

Now that we have weighed the three factors under the Mathews analysis, and concluded that S 531(5) and (6) do not adequately suffice to protect Sullivan's due process interests, we must decide how much process to afford employees receiving medical benefits under the Act prior to the termination of such benefits.

In only one case, Goldberg v. Kelly, 397 U.S. 306 (1970), which involved subsistence welfare benefits, has the Court required a full evidentiary hearing prior to the deprivation. In contrast, in Mathews, the Court concluded that an evidentiary hearing was not necessary before an individual was deprived of his/her Social Security benefits because, unlike the welfare benefits at issue in Goldberg, the disability payments were less likely to be the individual's sole source of income. The Court held that notice of the proposed reasons for the termination and advice as to how the recipient could obtain and submit additional information prior to the termination was sufficient to comport with pre-deprivation due process procedure. Similarly, in Loudermill, the Supreme Court determined that due process required that a tenured public employee be given oral or written notice of the charges against him/her, an explanation of the employer's evidence, and an opportunity to present her position prior to termination of her position. See 470 U.S. at 546.

While we believe that additional procedural safeguards will cure the problems currently at issue with the supersedeas provisions, due process does not require a Goldberg-style evidentiary hearing prior to the deprivation of medical benefits. Utilization review is premised upon

34

"routine, standard, and unbiased medical reports,"
Mathews, 424 U.S. at 344 (quoting Richardson v. Perales,
402 U.S. 389, 404 (1971)), from the treating physician,
reviewed by a physician in the same specialty who assesses
the case based upon generally accepted medical protocols,
principles, and practices. Issues of credibility and veracity
are less likely to be an issue in such a case. Accordingly,
the potential benefit of a pre-termination evidentiary
hearing -- or even an oral presentation to the medical
reviewer -- is substantially less in this context than in a
Goldberg-context. See, e.g., Mathews, 424 U.S. at 344-45.

Nevertheless, we think that at a minimum the employee
should be granted the opportunity to present additional
evidence such as his/her personal testimony in writing as
to the reasonableness and necessity of the disputed
treatment, as this could significantly lessen the risk of
erroneously depriving an employee of his/her medical
benefits. This may be particularly true for the recipient of
unorthodox, naturopathic, or non-traditional medical
treatments -- such as, for example, acupuncture or
chiropractic manipulation. Without some sort of indication
from the very individual who is receiving the questioned
medical treatment as to its success or the employee's
improvement, the risk of erroneously terminating an
employee's medical benefits is too high.

We are ever mindful of the fact that the supersedeas
provision contested in this case applies only to disabled
workers who may experience chronic pains over the course
of several years. Many of these workers may be disabled for
life. The personal written submission of such disabled
workers is critical to assessing the relative benefits that a
particular treatment or practice might have. While reading
medical reports and reviewing patients' charts might appear
to show relatively slight improvement, suggesting that the
medical treatment is unreasonable or unnecessary, a
particular treatment might be the only medical treatment
that alleviates an individual's pain or mitigates the severity
of his/her symptoms. As the utilization review process
concerns itself only with the specific medical practice that
is being challenged, see 34 Pa. Code S 127.470, the
reviewing physician may have little or no perspective as to

35

how a particular treatment is benefitting the patient in the context of the overall medical care that the employee has undergone during the course of his/her disability. [28] The opportunity for the employee to present his/her side of the story -- to introduce his/her own personal account as to how the particular treatment has ameliorated his/her condition -- may be highly relevant to the URO's determination and may not be adequately reflected or documented in the medical reports.

Cognizant of the governmental interest, we believe that this additional procedural safeguard of permitting an employee to submit his/her personal account in writing of the reasonableness or necessity of the disputed medical treatment would not prove unduly onerous or administratively burdensome or costly to implement. To the contrary, the present procedures could remain intact but with the exception that the employee be notified at a meaningful time and in a meaningful manner (prior to the termination of his/her medical benefits) that he/she can submit, if he/she so chooses, a letter or a statement to the URO regarding the reasonableness or necessity of his/her medical treatment. The reviewing physician could then consider the employee's account as part of the evidence considered when making his/her determination. We are not persuaded that this type of evidence would pose a problem for the reviewing physician, as doctors regularly make judgments about the course of treatments depending upon the input from their patients. The reviewing physician as part of the utilization review process would simply consider the employee's account of the medical treatment before rendering judgment.

In sum, we hold that the supersedeas provisions under S 531(5) and (6) violate the dictates of due process by not

_____

28. While we recognize that the regulations require that a URO attempt to obtain a complete set of medical records from all of an employee's medical providers for a particular injury, see 34 Pa. Code. S 127.462, there is no guarantee that all of an employee's records will be located, received, and reviewed during the utilization review. In any event, medical records provide but one component for consideration before an employee is deprived of his/her constitutionally protected interest in his/her medical benefits.

36

affording disabled employees notice or an opportunity to be heard before their medical benefits are suspended. To remedy the procedural defects in the statute, at a minimum, an employee must be given: (1) timely and reasonable notice of the imminent suspension of the medical benefits and treatment before the suspension takes effect; (2) a description of the reasons why utilization review has been invoked; (3) an opportunity and time to submit a personal statement in writing regarding the employee's view of the reasonableness and/or necessity of the disputed medical treatments; and (4) a description of the procedures under which the employee can appeal an adverse determination.

V.

In addition to the deficiencies we have discussed regarding the Commonwealth's statutes, we now consider whether the regulations governing utilization review provide adequate guidance to UROs and ALJs. We hold that they do.

Sullivan claims that the regulations governing utilization review fail to provide standards for determining whether the contested medical treatment is reasonable or necessary. Without such standards, Sullivan contends that the decisions by the UROs and ALJs are ad hoc, arbitrary, and without any consistency among the various UROs or ALJs such that those decisions violate her right to procedural due process under the Fourteenth Amendment. We cannot agree.

The district court properly held that the regulations in question provide sufficient guidance to reviewing physicians and ALJs to comport with due process. As in any case that is subject to utilization review, the inquiry solely focuses upon whether the medical treatment in question is reasonable and/or necessary. See 34 Pa. CodeS 127.470. In so doing, the regulations provide that the reviewing physician must be of the same specialty as the treating physician, see 77 Pa. Const. Stat. Ann.S 531(6)(i), and that the reviewer must analyze the disputed treatment in light of generally accepted medical protocols. See 34 Pa. Code

37

S 127.467. The reviewing physician may not consider whether the injury being treated is work-related, whether the employee continues to be disabled, whether the employee has reached maximum medical improvement, or whether the fees assessed for the services provided are reasonable. See id. S 127.470. Furthermore, the reviewer must provide a detailed opinion in writing that explains the basis for his/her determination. See id. S 127.472. Accordingly, the regulations provide guidelines which serve to provide necessary guidance to the reviewing physician concerning the appropriate bases for his/her determination such that the ultimate determinations are not arbitrary and do not discriminate.

Similarly, the de novo hearings before Workers' Compensation ALJs also comport with due process. As in any administrative hearing, the ALJ hears testimony, considers evidence, and renders decisions consistent with the applicable law. At these de novo hearings, an employee has the opportunity to present his/her own medical expert, the right to cross-examination of the witnesses, and the right to present additional evidence to support his/her claim. Further, the statute provides that the ALJ shall consider -- but is not bound by -- the report from the utilization review. See 77 Pa. Const. Stat. Ann. S 531(6)(iv). There is no indication that the de novo hearings in the utilization review context suffer from any different procedure or lack of guidance than any other administrative hearing of which we are aware. Accordingly, we hold that the regulations provide sufficient guidance to the reviewing physicians and the ALJs in evaluating employees' cases such that the employees' rights to procedural due process are honored.

VI.

We now address whether imposing the costs of reconsideration review upon a losing employee -- without giving him/her proper notice beforehand -- violates due process.

Before the amendments in Act 57, if either party disagreed with the decision rendered by the URO, that

38

party could petition the Bureau for reconsideration review within thirty (30) days of receiving the decision. See 34 Pa. Code S 127.502(a). Unlike the initial utilization review, however, where the employer or insurer paid for the review, the Bureau advanced the costs of reconsideration review and charged the losing party for the cost thereafter. While Act 57 eliminated reconsideration review, Act 57 did not become effective until August 23, 1996, nearly three months after the amended complaint in this action was filed. Thus, most of the Plaintiffs before us were subjected to the costs of reconsideration review when they suffered an adverse decision upon reconsideration. It is unclear from the undeveloped record below, however, whether any of the Plaintiffs actually paid these reconsideration fees.

Sullivan contends that the imposition of a fee upon a losing employee violated an employee's right to due process because such a fee was imposed without any notice, without an opportunity to be heard on the underlying contested claim, and without any consideration for the employee's ability to pay. There was no in forma pauperis status for reconsideration. Sullivan further asserts that such a scheme violated the liberty interests of employees because one may have foregone reconsideration review rather than risk paying the substantial costs of reconsideration if he/she lost.[29]

We do not decide whether the imposition of costs on reconsideration without notice violated the dictates of due process. As the Act has been amended, reconsideration review no longer exists, these fees are no longer imposed, and thus, this is not a continuing problem. Further, given the undeveloped record, we cannot determine whether any of the Plaintiffs, in fact, paid these fees. Accordingly, we remand to the district court to determine whether any of the Plaintiffs paid the costs of reconsideration, what those costs were, and to re-examine the possible constitutional difficulties that the imposition of reconsideration fees poses.

_____

29. The costs of reconsideration review varies. The typical charge is several hundred dollars. See Am. Compl. P 77.

VII.

At this juncture, we raise an Eleventh Amendment sovereign immunity issue sua sponte as it is relevant to our jurisdiction over the Commonwealth Defendants. See V–1 Oil Co. v. Utah State Dep't of Pub. Safety, 131 F.3d 1415, 1419 (10th Cir. 1997) (raising Eleventh Amendment sovereign immunity sua sponte); Suarez Corp. Indus. v. McGraw, 125 F.3d 222, 227 (4th Cir. 1997) ("We believe that, because of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, even sua sponte."); Atlantic Healthcare Benefits Trust v. Goggins, 2 F.3d 1, 4 (2d Cir. 1993) (raising Eleventh Amendment issue sua sponte); Charley's Taxi Radio Dispatch Corp. v. Sida of Hawaii, Inc., 810 F.2d 869, 873 n.2 (9th Cir. 1987) (same); but see Bouchard Transp. Co. v. Florida Dep't of Envtl. Protection, 91 F.3d 1445, 1448 (11th Cir. 1996) (stating that the "Eleventh Amendment is not jurisdictional in the sense that courts must address the issue sua sponte").

The Eleventh Amendment[30] confers sovereign immunity upon the States such that they cannot be subject to suit in district court absent either Congressional intent to abrogate that immunity enacted pursuant to a valid exercise of power, see Seminole Tribe v. Florida, #6D 6D6D# U.S. ___, 116 S. Ct. 1114, 1123 (1996), or a State's explicit consent. See Port Auth. Trans–Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990). The Eleventh Amendment, however, does not immunize State officials for actions taken in their individual capacities. See Scheur v. Rhodes, 416 U.S. 232, 237–38 (1974).

The amended complaint does not make clear whether the Plaintiffs have brought suit against the Commonwealth Defendants in their official or individual capacities, or both.

_____

30. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

We leave this for the district court to decide. If the district court determines that the Commonwealth Defendants have only been sued in their official capacities, the district court -- in its discretion -- may allow the Plaintiffs to amend their complaint to include those Defendants in their individual capacities. In any event, the district court will be obliged to address whether redress can be sought against the Commonwealth Defendants in federal court under Eleventh Amendment proscriptions.

VIII.

In conclusion, we hold that the supersedeas provisions of 77 Pa. Const. Stat. Ann. S 531(5) and (6), are unconstitutional in that they violate an employee's procedural due process rights by failing to provide adequate notice that his/her medical benefits may be suspended upon the invocation of utilization review and by not granting the employee an opportunity to respond in writing before that termination takes effect. We also hold that the private insurance companies are state actors and thus may be joined in a S 1983 action when they elect to invoke the supersedeas provisions to terminate or suspend an employee's constitutionally protected interests in receiving medical benefits.

Thus, we will reverse the order of the district court dismissing Sullivan's complaint and will remand to the district court for further proceedings in accordance with this opinion. On remand, among other issues, the district court should address the issue of reconsideration fees, the question of certifying a class, and for the first time, it should consider whether it has subject matter jurisdiction over the Commonwealth Defendants in light of Eleventh Amendment sovereign immunity.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit